IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MICHAEL GUNDERSEN,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>METROPOLITAN LIFE INSURANCE<br>COMPANY,<br><br>　　　　　　　　　Defendant. | **MEMORANDUM DECISION AND<br>ORDER REGARDING DISCOVERY**<br><br>Case No. 2:10-CV-50 DB<br><br>District Judge Dee Benson<br>Magistrate Judge David Nuffer |

During scheduling, a conflict between the parties arose over whether discovery would be allowed in this ERISA case. The magistrate judge instructed the parties to brief the issue[1] which they did.[2]

## Background

While working as an employee of Intermountain Healthcare (IHC), Michael Gundersen (Gundersen) received insurance benefits through IHC's Healthcare Life Insurance Plan (the Plan).[3] IHC purchased this policy from the Metropolitan Life Insurance Company (MetLife), which both insures and administers the Plan.[4] Gundersen's benefits under the Plan included accidental death and dismemberment (AD&D) coverage of up to a maximum benefit of

---

[1] Minute Entry, docket no. 24, filed August 3, 2010.

[2] Plaintiff's Request for Leave to Conduct Limited Discovery (Gundersen's Request), docket no. 21, filed July 30, 2010; MetLife's Response to Gundersen's Request for Leave to Conduct Limited Discovery (MetLife's Response), docket no. 33, filed September 27, 2010; Plaintiff's Reply Memo in Support of Motion for Leave to Conduct Limited Discovery (Gundersen's Reply), docket no. 35, filed October 4, 2010.

[3] MetLife's Response at 3; Gundersen's Request at 4.

[4] *See* MetLife's Response at 3; Gundersen's Request at 4.

$200,000.[5]  The Plan provided for payment of one-half the full amount for a severed foot or for paraplegia, as long as the total claim remained below the full amount.[6]

In June of 2008, a serious motorcycle accident left Gundersen paralyzed below his waist and required amputation of his right leg at the knee.[7]  Gundersen made a claim to MetLife through IHC for the loss of his leg and received $150,000 in August of 2009.[8]  Gundersen made a second claim for "complete paralysis below the waist."[9]  On February 2, 2009, MetLife denied Gundersen's second claim for coverage of his paralysis ("we must deny you [sic] claim"[10]) because, according to MetLife, the Plan defined paralysis as the "the loss of use, *without severance*, of a limb."[11]

Before the denial, IHC asked MetLife for a quick "turnaround" on Gundersen's denial letter.[12]  MetLife's Account manager informed the Senior Claims Examiner that IHC was watching "like a hawk" how they handled the denial, and the Claims Examiner agreed to "rush."[13]

Gundersen appealed the denial of the paralysis claim,[14] and provided a statement from his physician that the amputation and paralysis were two unrelated losses caused by the same

---

[5] MetLife's Response at 3; *see also* Gundersen's Request at 4.

[6] MetLife's Response at 3; *see also* Gundersen's Request at 4.

[7] Gundersen's Request at 4; MetLife's Response at 4.

[8] Gundersen's Request at 4; MetLife's Response at 4.

[9] MetLife's Response at 4.  This claim document has not been included in the record by either party.

[10] Letter, February 2, 2009, MetLife to Gundersen, attached as Exhibit 2 to MetLife's Response.

[11] MetLife's Response at 4 (emphasis in original); *see also* Gundersen's Request at 4.

[12] MetLife's Response at 8.

[13] *Id.* at 8-9 (citing Rec 159).

[14] Letter, Gundersen to MetLife, attached as Exhibit 3 to MetLife's Response.

motorcycle crash.[15]  But on August 19, 2009 MetLife again found that Gundersen's loss of his leg disqualified his claim under the Plan.[16]

Gundersen's appeal said he would take the necessary legal action to receive the denied benefits.[17]  Before deciding the appeal, MetLife sought legal advice from its in-house counsel, which was recorded on a document, dated August 4, 2009, in the administrative record.[18]  When MetLife produced this document as part of the administrative record, it was redacted to omit the legal advice, which MetLife claims is privileged information[19]

### Claim and Counterclaim

This denial on appeal led Gundersen to file this lawsuit in January 2010.[20]  With its Answer, MetLife asserted a counterclaim to recover an alleged *overpayment* of benefits to Gundersen.[21]  MetLife claims that it mistakenly paid $150,000 in benefits for Gundersen's amputated leg which is three-quarters of the $200,000 full policy amount rather than $100,000 (one-half the policy amount) which it owed under the Plan.[22]

### Gundersen Proposes Discovery

Gundersen seeks to conduct discovery.  Because this is an ERISA case, the court does not normally schedule a discovery time frame or set limits on use of discovery tools.  However,

---

[15] Gundersen's Request at 5.

[16] MetLife's Response at 4 & n.4.  The letter is attached as Exhibit 4 to MetLife's Response.

[17] *Id.* at 4.

[18] *Id.* at 15.  The document is attached as Exhibit 6 to MetLife's Response.

[19] *Id.*

[20] Gundersen's Request at 3.

[21] MetLife's Response at 4, 14; *See also* Gundersen's Request at 3.

[22] MetLife's Response at 4.

Gundersen claims discovery is appropriate on his claim, as well as on MetLife's counterclaim.[23]

Gundersen seeks:

- information regarding MetLife's incentive, bonus and compensation practices;[24]
- historical data from MetLife relating to claim processing arising out of AD&D policies involving multiple losses relating to a single accident;[25]
- information about policies and procedures in place for MetLife when it originally processed Gundersen's claim and subsequently considered his appeal of MetLife's denial;[26]
- statistical information about the number of claims processed by MetLife within a given time frame, the number of those claims which were paid and which were denied;[27] and
- statistical information for claims involving more than one loss arising out of an accident or injury.[28]

### Discovery in ERISA Cases Involving
### Conflict of Interest and Procedural Irregularities

When courts review the denial of benefits under an ERISA plan giving the administrator discretion, the very deferential "abuse of discretion" standard of review generally applies.[29] In *Metropolitan Life Insurance Co. v. Glenn*, the Supreme Court held that this deferential review standard applies even when a conflict of interest potentially affects the benefits decision. This conflict arises when "a plan administrator both evaluates claims for benefits and pays benefits claims."[30] In spite of the deferential review standard that may apply if a conflicted administrator has discretion, the Court said "the reviewing judge [is required] to take account of the conflict when determining whether the [plan administrator], substantively or procedurally, has abused his

---

[23] Gundersen's Request at 2-3.

[24] Gundersen's Request at 9.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).

[30] *Id.* at 112.

discretion."[31]   In the wake of *Glenn*, courts have struggled to determine what, if any, discovery is appropriate in these sorts of ERISA cases to enable a judge to "take account of the conflict."[32]

The recent Tenth Circuit opinion in *Murphy v. Deloitte & Touche Group Insurance Plan*[33] gives much needed guidance to trial courts regarding discovery in ERISA cases where an inherent dual role conflict of interest exists because a single entity both insures (pays claims) and administers a benefit plan.  The opinion clarifies prior cases and declares several standards which are summarized here with citations from the case.

- **Discovery is not allowed in ERISA cases on the issue of a claimant's eligibility.**

    As a starting point, we have frequently, consistently, and unequivocally reiterated that, in reviewing a plan administrator's decision under the arbitrary and capricious standard, the federal courts are limited to the administrative record.  Because we generally restrict district courts' review of an administrator's decision to the administrative record and because Federal Rule of Civil Procedure 26(b)(1) permits discovery only where it appears reasonably calculated to lead to the discovery of admissible evidence, extra-record discovery would generally seem inappropriate.[34]
    . . . .
    . . . [Tenth Circuit] case law prohibits courts from considering materials outside the administrative record where the extra-record materials sought to be introduced relate to a claimant's eligibility for benefits.[35]

- **In cases where a dual role conflict of interest[36] is alleged, some discovery may be needed for both sides to have necessary evidence of the *seriousness* of the conflict.**

    If an administrator operates under a dual role conflict of interest, the district court must always weigh the conflict of interest in its abuse of discretion

---

[31] *Id.* at 115.

[32] For a survey of the field after *Glenn*, see Elizabeth J. Bondurant, *Standard of Review and Discovery after Glenn: The Effect of the Glenn Standard of Review on the Role of Discovery in Cases Involving Conflicts of Interest*, 77 Def. Couns. J. 120, 124–32 (2010).

[33] *Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151 (10th Cir. 2010).

[34] *Id.* at 1157 (citations and quotation marks omitted).

[35] *Id*. at 1162.

[36] The *Murphy* opinion also suggests discovery would be appropriate in cases involving procedural irregularities.  *Id.* at 1160.

analysis, but it must allocate the conflict more or less weight depending on its seriousness. But, without discovery, a claimant may not have access to the information necessary to establish the seriousness of the conflict. Similarly, the administrator may not be fully able to rebut a claim of conflict by showing that it has taken active steps to reduce potential bias and to promote accuracy . . . . [I]f the district court cannot consider material beyond the administrative record, it may not be able to fulfill its judicial task of allocating the proper weight to the conflict of interest.[37]

- **Discovery may be necessary to prove the probable effect of a conflict of interest.**

  [A claimant] might be able to argue that discovery, appropriately circumscribed, is appropriate to allow her to determine, and present evidence on . . . the likelihood that [the conflict of interest] jeopardized [the] decisionmaking process in her case.[38]

- **Discovery of claims administration practices may be proper, but review of the merits of other individual claims must be balanced against the utility of such discovery.**

  In *Glenn*, the Supreme Court explained that a conflict of interest weighs more heavily against an administrator where it has a history of biased claims administration. . . . Although the Supreme Court did not explicitly state that the district court could consider extra-record materials or that a claimant could discover extra-record materials, it must have contemplated that, at least in some cases, discovery and consideration of extra-record materials may be necessary and appropriate as an administrative record is not likely to contain the details of a history of biased administration of claims.[39]

  The magistrate judge was understandably concerned by the breadth of Ms. Murphy's discovery request, which sought extensive evidence of how the administrator and independent physicians had resolved other cases. We appreciate the magistrate judge's concern that this discovery could create a morass of secondary and remote arguments going to which other cases are comparable and relevant to showing prejudice or bias in this case. The utility of such expansive discovery is likely in all but the most unusual cases to be outweighed by the burdensomeness and costs involved. In any event, the

---

[37] *Id at* 1157-58 (citations and quotation marks omitted).

[38] *Id.* at 1164. The Murphy court notes that in *Wolberg v. AT & T Broadband Pension Plan*, "[it] explicitly criticized the plan participant for failing to seek discovery that could have proven the seriousness of the conflict of interest." *Id.* at 1160 (citing *Wolberg*, 123 Fed. Appx. 840, 846 n.3 (10th Cir. 2005) (unpublished)).

[39] *Id.* at 1161 (citations omitted).

balancing of these concerns will be vested in the sound discretion of the magistrate judge upon remand.[40]

- **"The party moving to supplement the record or engage in extra-record discovery bears the burden of showing its propriety."[41]**

- **No special rules should govern discovery in ERISA cases.**

    [In *Glenn*], the Supreme Court rejected other approaches to handling a dual role conflict, such as shifting to the administrator the burden of proving its decision was reasonable. *Glenn* explained that it was not "necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict."[42]
    . . . .
        . . . *Glenn's* admonition against special rules . . . also commands that we not create any special rules for discovery related to a dual role conflict of interest.[43]

- **Federal Rule of Civil Procedure 26(b) applies to ERISA discovery.**

    [W]e must apply Federal Rule of Civil Procedure 26(b) to discovery requests seeking information related to a dual role conflict of interest, just as we would apply that rule to other discovery requests.[44]

    Rule 26(b)(1) permits discovery only of "[r]elevant information" and the discovery must "appear[ ] reasonably calculated to lead to the discovery of admissible evidence." Moreover, all discovery is limited by Rule 26(b)(2), which protects against, *inter alia*, overly burdensome discovery requests, discovery of cumulative materials, and overly costly discovery requests.[45]

- **Several factors will militate against broad discovery.**

    - ***ERISA litigation must be speedy, inexpensive and efficient.***

        [S]everal factors . . . militate against broad discovery. First, while a district court must always bear in mind that ERISA seeks a fair and

---

[40] *Id.* at 1164 n.9 (citation omitted).

[41] *Id.* at 1163.

[42] *Id.* at 1162 (citations omitted) (quoting *Glenn,* 554 U.S. at 116.

[43] *Id.* at 1162.

[44] *Id.*

[45] *Id.* at 1163 (alterations in original).

informed resolution of claims, ERISA also seeks to ensure a speedy, inexpensive, and efficient resolution of those claims.[46]

[N]either a claimant nor an administrator should be allowed to use discovery to engage in unnecessarily broad discovery that slows the efficient resolution of an ERISA claim.[47]

- ***Adverse financial interest may often be obvious by the dual role.***

  [T]he benefit of allowing detailed discovery related to the administrator's financial interest in the claim will often be outweighed by its burdens and costs because the inherent dual role conflict makes that financial interest obvious . . . .[48]

- ***Evidence supporting claim denial may be so substantial that a conflict would not make a difference in the outcome.***

  [T]he substantive evidence supporting denial of a claim is so one-sided that the result would not change even giving full weight to the alleged conflict.[49]

- ***Thoroughness of the record (or lack thereof) may reveal that a conflict had no effect or that an alleged conflict is enough to warrant reversal.***

  [A] district court may be able to evaluate the effect of a conflict of interest on an administrator by examining the thoroughness of the administrator's review, which can be evaluated based on the administrative record. . . . [A] district court may allocate significant weight to a conflict of interest where the record reveals a lack of thoroughness.[50]

### Determining Allowable Discovery - Procedure

*Murphy* provides little procedural guidance. In the normal civil case, discovery is presumptively allowed. After discovery is promulgated, it is often refined by the practicality of a response, by the parties' negotiation or by court order. In this case, the dispute about *permitting*

---

[46] *Id.*

[47] *Id.* at 1162-63.

[48] *Id.* at 1163.

[49] *Id.*

[50] *Id.* at 1163-64.

discovery has evolved into *pre-approval* of discovery text. It is challenging for an ERISA plaintiff to explain the precise need for interrogatories and requests for production when the plaintiff is in possession of far less information than the defendant. Without knowing the Tenth Circuit's view as to when a trial court should address propriety of discovery in an ERISA conflict case, the magistrate judge will take the issues now presented and decide what discovery, if any, is allowable, applying the *Murphy* principles.

Fortunately, this case has permitted the parties to brief the need for discovery in light of the administrative record. Each has cited to the record to argue the need (or lack of need) for specific discovery.

## Application of *Murphy* Standards to this Case

Most of the principles from *Murphy* are readily applied to this case. It is important to note, however, that *Murphy* does not apply to discovery on the counterclaim. The counterclaim is not a participant's petition for review of claim denial.[51]

This is clearly a case with a dual role conflict of interest because MetLife is funding and administering the plan. Also, this is a case with evident procedural irregularities because the claims are related and MetLife's counterclaim alleges that it did not properly pay the amputation claim. *Murphy* implies that discovery is permissible to understand "procedural irregularities."[52]

No discovery of the medical issues of claim eligibility is necessary. Gundersen's conditions are not at all in dispute. The questions on the claim and counterclaim are plan interpretation and practice. This limitation of discovery scope is consistent with ERISA's goal of speedy, inexpensive and efficient claim resolution.

---

[51] Gundersen's Request at 5-7.

[52] *See Murphy*, 619 F.3d at 1160, 1162.

This is not a case where the evidence in the record supports denial and refund so clearly that discovery is not necessary. The refund counterclaim admits MetLife's plan interpretation is unclear. There are also several "loose ends" in the record that Gundersen points to as requiring discovery:

> Among other things, included in the pre-litigation appeal record ("AR"), which has been filed with the Court, are documents indicating a heightened concern and interest with Gundersen's claim on the part of MetLife. However, the AR lacks explanation or information about the source or basis of MetLife's concern. *See*, AR 000159; AR 000169. Gundersen seeks additional information about the name and title of the "customer (VP's)" identified at AR 000159, why he or she was "watching [the processing of Gundersen's claim] like a hawk," information about "Rebecca Mays" and her discussion with "the law department" about Gundersen's claim identified at AR 000169 and seeks production of an unredacted copy of pages 000169-170 from MetLife. [53]

The record is not so comprehensive and complete as to eliminate the need for discovery.

While adverse financial interest is obvious by reason of MetLife's dual role, that single factor is not enough to end the inquiries in this case because of the serious issues presented about the procedures and plan interpretation. To enable the flexible analysis *Glenn* contemplates by its rejection of a talismanic detailed set of instructions,[54] Gundersen needs access to other information beyond the bare existence of MetLife's adverse financial interest. By understanding the interpretation of plan terms, the district judge can understand "the likelihood that [the conflict of interest] jeopardized MetLife's decisionmaking process in [this] case."[55]

*Murphy* requires reference to the standard constraints of Rule 26(b), in light of the concern that ERISA litigation must be speedy, inexpensive and efficient. In this examination, *Murphy's* mandate against "special rules" must be remembered. And just as *Murphy* took

---

[53] Gundersen's Request at 9 (alteration in original).

[54] *Glenn,* 554 U.S. at 119.

[55] *Murphy*, 619 F.3d at 1164.

*Glenn's* counsel "against special procedural and evidentiary rules . . . to apply also to discovery rules,"[56] this court will take that advice and treat this case just as any other civil case when analyzing permissibility of discovery. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense — including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter."[57] Discoverability is not admissibility.

Pre-service examination of discovery requests is highly unusual, so the magistrate judge will attempt to examine the proposed discovery (which has been thoroughly briefed in light of *Murphy*) as if a motion to compel and protective order were pending.

### Interrogatories and Requests for Production[58]

Interrogatory No. 1 seeks information about the person(s) answering the discovery.[59] Similarly, Request No. 1 seeks all documents relied on in responding to the interrogatories.[60] These are foundational and permitted.

Interrogatory No. 2 seeks information about the decision makers on the denial of benefits,[61] while Interrogatory No. 4 seeks information about the medical evaluators.[62] MetLife

---

[56] *Id.* at 1162.

[57] Fed. R. Civ. P. 26(b)(1).

[58] The proposed interrogatories and requests for production are attached as Exhibit C to Exhibits to Plaintiff's Request for Leave to Conduct Limited Discovery, docket no. 22, filed July 30, 2010.

[59] INTERROGATORY NO. 1: Identify each person making, and assisting with, your Interrogatory responses, including each person's name, age, address, occupation, current title and relationship to MetLife.

[60] REQUEST NO. 1: Produce each and every document identified or relied on in preparing the responses to the Interrogatories above.

[61] INTERROGATORY NO. 2: Identify the specific person, or if a committee, the names of committee members, who was or were responsible for the decision to deny benefits to the Plaintiff under the Plan in this case at each level at which the case was considered or appealed, and for each person, provide the person's title, length of employment with MetLife or any related entities, and professional qualifications.

says "[t]hese interrogatories are duplicative of information contained in the administrative record with respect to the identity of the persons involved in the claim review."[63] Certainly all persons identified in the record will be named in these responses, but there may be persons outside the record who nonetheless were involved. Without deciding whether that is true, given the light burden imposed by these interrogatories, these interrogatories are permissible.

These interrogatories also seek information regarding these persons' title, length of employment and qualifications. This information will verify MetLife's compliance with ERISA regulations which require that an insurer issuing a denial of benefits:

> (iii) Provide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment; (iv) Provide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination.[64]

MetLife argues with one of Gundersen's justifications for this discovery. Gundersen says he needs this discovery to explore "a heightened concern and interest with Gundersen's claim on the part of MetLife."[65] Gundersen cites a letter in the record saying that IHC was watching MetLife "like a hawk."[66] MetLife then argues, for a page, the facts surrounding the document to

---

[62]    INTERROGATORY NO. 4:  Please state the names of each and every person who provided any medical analysis, evaluation, consultation, opinion, or advice at the behest of MetLife, related in any manner to the Plaintiff's claim in this case; and for each such individual, state their employer, job title, length of employment with MetLife or any of its related entities.

[63] MetLife's Response at 7.

[64] 29 C.F.R. § 2560.503-1(h)(3)(iii) through (iv).

[65] Gundersen's Request at 9.

[66] *Id.* (citing Rec. 159).

which Gundersen refers.[67]  MetLife concludes that when "viewed in context" there is no reason to inquire as to the apparent special handling of Gundersen's claim.[68]

The processing of the denied claim and the allegedly overpaid claim is in dispute.  The subjects are fair for discovery.  The stage of issuing discovery is not the time to adjudicate the factual context of ambiguous statements.

Interrogatories 3 and 5 seek information about the compensation of the persons who made decisions on the denied claim or medical evaluations of Gundersen.[69]  *Glenn* suggests that structural safeguards or the lack thereof may be relevant in evaluating the weight to give a conflict of interest.  Whether an "administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits"[70] is a pertinent area for inquiry.  *Murphy* also notes that "the extent to which the administrator has insulated its decisionmaking process from its financial interest may not be obvious."[71]  *Murphy* gives one example of a structural safeguard meriting discovery:  "For example, discovery related to how an administrator structures its compensation for the independent physicians that reviewed a plan participant's claim might be appropriate to determine if the administrator took steps to insulate the independent reviewers

---

[67] MetLife's Response at 8-9.

[68] MetLife's Response at 9.

[69]      INTERROGATORY NO. 3:  For each individual identified in response to Interrogatory No. 2, identify the rate of pay, bonuses paid, awards or other indices of recognition for job performance for the entire time period since the person was first employed by MetLife or any related entities.

     INTERROGATORY NO. 5:  For each individual identified in response to Interrogatory No. 4, identify the time period since the person was first employed by MetLife or any related entities, the rate of pay, bonuses paid, awards or other indices of recognition for job performance; if such a person was paid under any status other than that of an employee, please fully explain how such individual was paid.

[70] *Glenn*, 554 U.S. at 117.

[71] *Murphy*, 619 F.3d at 1163 n.7.

from the administrator's obvious financial interest."[72]   Similarly, if pay incentivizes denial, that

would be very pertinent to the ultimate analysis in this case, making discovery appropriate.

Request No. 3 seeks medical evaluations.[73]   While these should be in the record, and

there should be relatively little burden in production, Gundersen's medical status does not seem

to be in dispute.   And at this early stage of the litigation, it does not appear that MetLife relies on

medical rationale for its counterclaim. This request will be stricken.

Interrogatories 6, 7 and 8 seek information on the financial reserves for Gundersen's

claims and the impact of claims payment on Intermountain Health Care.[74]   Again, this is a topic

related to the financial impact of a claim, and its impact on the parties.   The interrogatories lay

the groundwork for the next interrogatory, Interrogatory No. 9, which seeks the names of persons

who *knew* the reserves for Gundersen's claims.[75]   These inquiries follow the suggestions in

*Glenn* and *Murphy* that insulation of claims decision makers from financial information is

important to evaluation of the effect of a conflict.

---

[72] *Id.*

[73]     REQUEST NO. 3:  Produce any and all medical opinions, reports, memoranda, emails, correspondence and/or any other documents reflecting a review of Plaintiff's medical records by a person or persons with medical expertise in connection with the original payment of benefits, denial of eligibility for additional benefits or subsequent denials of coverage during the appeal process for Plaintiff's claim.

[74]     INTERROGATORY NO. 6:  Please state the source of funding for any benefits that were paid, would be paid in the future, or would have been paid in the past to the Plaintiff had the Plaintiff been found eligible for additional benefits under the AD&D policy.

     INTERROGATORY NO. 7:  Please describe with particularity the financial relationship between MetLife and Intermountain Healthcare, the employer/plan administrator /policy holder, with respect to the administration, interpretation and funding of the group life insurance policy, including without limitation in your answer, any financial impact on Intermountain Healthcare when MetLife must pay claims under the policy.

     INTERROGATORY NO. 8:  State the amount in dollars of the reserves assigned to this claim, the name and titles of the individuals involved in calculating this amount, each individual's actions or responsibilities in said calculations and identify all criteria or guidelines used by the MetLife for this purpose.

[75]     INTERROGATORY NO. 9:  Provide the names, titles, and position of each person who was provided the information regarding the value or reserves of the Plaintiff's claim discussed in Interrogatories 6 and 8.

Interrogatories 10 and 14 ask for identification of the claim handling guidelines and

interpretations applicable to the AD&D Plan.[76]  Request No. 2 seeks the documents.[77]  These

interrogatories and this request are not challenged by MetLife.[78]

Interrogatories 11-13 seek information about claims handling for cases involving multiple

losses in one accident.[79]  Request No. 4 seeks the documents.[80]  Gundersen correctly states these

requests relate "directly to ERISA's claims processing regulations that require ERISA plans to

---

[76]     INTERROGATORY NO. 10:  Please identify any and all internal guidelines, policies, procedures, claims
handling manuals, internal communications (whether hand written, typed, emailed or in any other form)
and memoranda in existence during the time this claim was considered, either on initial application or on
further appeal(s), concerning the interpretation and/or administration of the policy issued in this case that
are not contained in the record provided to the Plaintiff's counsel, including but not limited to redacted
documents included in the Defendant's Privilege Log, Bates stamped pp. 169-170.

INTERROGATORY NO. 14:  Please identify any and all internal guidelines, policies, procedures, claims
handling manuals and memorandum in existence during the time this claim was considered, either on initial
application or on further appeal(s), concerning the interpretation and/or administration of the policy issued
in this case that are not contained in the record provided to the Plaintiff's counsel including, but not limited
to, calculation of benefit payments for specific losses or injuries not contained in the policy.

INTERROGATORY NO. 15:  Please identify any and all internal guidelines, policies, procedures, claims
handling manuals and memorandum in existence during the time frame at issue in this case concerning the
interpretation and/or administration of a claim submitted under an ERISA-governed plan as opposed to a
non-ERISA plan.

[77]     REQUEST NO. 2:  Produce any and all documents outlining the duties and responsibilities of MetLife and
the plan administrator/employer in connection with administration of the Plan, processing claims for
benefits under the Plan, considering appeals of denials of benefits under the Plan and who has discretion to
determine eligibility for benefits under the Plan.

[78] MetLife's Response at 13.

[79]     INTERROGATORY NO. 11:  Identify the number of claims submitted to MetLife for AD&D benefits
which involve more than one injury or loss arising out of a single accident for each of the years 2005
through the present.

INTERROGATORY NO. 12:  Identify all claims procedures and policies in connection with processing,
evaluating and paying or denying the claims for multiple losses occurring in a single accident identified in
response to Interrogatory No. 11.

INTERROGATORY NO. 13:  Of the claims identified in response to Interrogatory No. 11 above, describe
how many times MetLife has paid the benefit for only one of the two or more losses or injuries.

[80]     REQUEST NO. 4:  Produce any and all claims manuals, procedures, guidelines, instructions, training
materials and/or any other documents utilized by MetLife employees/claims processors in determining the
amount that will be paid in connection with a claim:
• for accidental death and dismemberment benefits generally;
• for accidental death and dismemberment claims which involve more than one loss or injury;
• for specific losses not enumerated in the policy; and
• were specifically utilized in evaluating the Plaintiff's claim.

put in place safeguards to ensure that ERISA plans treat similarly situated participants and beneficiaries in like fashion."[81]  "In addition, 29 C.F.R. §2560.503-1(m)(8)(iii) specifically states that documents demonstrating compliance with 'the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section' are 'relevant documents' under ERISA's claims procedure regulations and must be produced by an ERISA fiduciary upon request."[82]  The heart of the overpayment counterclaim will rest on these documents as the court determines precisely how the plan documents apply to Gundersen.

Interrogatory No. 15 seeks comparative information regarding non-ERISA plans.[83] Gundersen claims this interrogatory relates to the same C.F.R. section cited above.[84]  However, the regulation speaks of similar situations in the *ERISA regulated* plan and says nothing about comparative practices under plans outside ERISA regulation.  This interrogatory is stricken.

Request No. 6 seeks agreements about plan administration and was not the subject of any MetLife objection.[85]

## Attorney Client Privilege

The parties have addressed a specific discovery issue that arises on the face of the administrative record.  Before a decision on Gundersen's appeal, MetLife sought legal advice

---

[81] Gundersen's Reply at 7.

[82] *Id.* at 7-8.

[83]      INTERROGATORY NO. 15:  Please identify any and all internal guidelines, policies, procedures, claims handling manuals and memorandum in existence during the time frame at issue in this case concerning the interpretation and/or administration of a claim submitted under an ERISA-governed plan as opposed to a non-ERISA plan.

[84] Gundersen's Reply at 6-7 (citing 29 C.F.R. § 2560.503-1(b)(5)).

[85]      REQUEST NO. 6:  Produce any and all documents under which the group life insurance/accidental death and dismemberment policy is established and/or operated, including but not limited to any administrative services agreement, contract or other documents which define the relationship between MetLife and the employer/plan administrator.

from its in-house counsel, which was recorded on a document dated August 4, 2009.[86]  This was

before the August 19th final decision denying his appeal.[87]  When MetLife produced this

document in the administrative record it was redacted to omit the legal advice, which MetLife

claims is privileged information.  The proposed discovery specifically seeks this document, and

information about it, without redaction.[88]

Communications between attorneys and their clients enjoy a privileged status.[89]  In the

context of ERISA, however, administrators owe a fiduciary duty to their beneficiaries that

creates an exception to the attorney-client relationship.[90]  Courts have thus come to recognize a

"fiduciary exception" to the attorney-client privilege that applies when plan administrators seek

legal advice concerning fiduciary matters.[91]  The exception arises because "as a representative

for the beneficiaries of the trust which he is administering, the trustee is not the real client in the

sense that he is personally being served."[92]  Because the trust beneficiaries are the real clients

when such advice is given, the privilege does not prevent disclosure to them.

The rule has been said to arise in "hoary English fiduciary exception precedents:"[93]

[T]he seminal English opinion from which the fiduciary exception sprang
distinguished between two items of legal advice: one dispensed to trustees prior to

---

[86] The document is attached as Exhibit 6 to MetLife's Response.

[87] Gundersen's Request at 13; *See also* MetLife's Response at 17-18.

[88]      INTERROGATORY NO. 10:  Please identify any and all . . . internal communications . . . concerning the interpretation and/or administration of the policy issued in this case that are not contained in the record provided to the Plaintiff's counsel, including but not limited to redacted documents included in the Defendant's Privilege Log, Bates stamped pp. 169-170.

      REQUEST NO. 5:  Produce an un-redacted version of the document(s) included in the Defendant's Privilege Log, Bates stamped pp. 169-170.

[89] *United States v. Mett*, 178 F.3d 1058, 1062 (9th Cir. 1999).

[90] *Id.* at 1062-63.

[91] *Id.*; *see also In re Long Island Lighting Co.*, 129 F.3d 268, 271-72 (2d. Cir. 1997).

[92] *Mett,* 178 F.3d at 1063.

[93] *Id.*

any threat of suit, advising them regarding the propriety of paying advances to the children of the testator, and one dispensed after the commencement of suit, aimed at advising them "how far they were in peril." *Talbot v. Marshfield*, 12 L.T.R. 761, 762 (Ch. 1865). The English court required the trustees to produce the first item, but not the second.[94]

The leading American case[95] ordered production of "a memorandum containing legal advice about a trust's state tax obligations . . . in a subsequent lawsuit by the beneficiaries to surcharge the trustees for the resulting tax liability."[96] The opinion was prepared in the course of administration of the trust, not in anticipation of any litigation against the trustees, though clearly failure to comply with the law would have created liability and was the subject of the case before the court.[97]

Not surprisingly, courts have faced difficulty in classifying advice as given in fiduciary or non-fiduciary capacity.[98] Case authorities agree that the analysis ultimately depends on the context and content of the disputed communication.[99] Both parties here rely on the Ninth Circuit's guidance:

> On the one hand, where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries. On the other hand, where a plan fiduciary retains counsel in order to defend herself against the plan beneficiaries . . ., the attorney-client privilege remains intact.[100]

---

[94] *Id.*.

[95] *Riggs Nat'l Bank v. Zimmer,* 355 A.2d 709 (Del.Ch.1976).

[96] *Fischel v. Equitable Life Assurance*, 191 F.R.D. 606, 607-608 (N.D. Cal. 2000) (citing *Riggs*, 355 A.2d at 709).

[97] Riggs, 355 A.2d at 711.

[98] *Fischel*, 191 F.R.D. at 608.

[99] *See Mett*, 178 F.3d at 1064; *see also Fischel*, 191 F.R.D. at 610; *Hudson v. General Dynamics*, 73 F.Supp.2d 201, 203 (D. Conn. 1999).

[100] *Mett*, 178 F.3d at 1064.

Courts have agreed that administrators' communications seeking legal advice concerning "plan design, amendment, and termination" do not fall within the fiduciary exception to the attorney client privilege, and are privileged.[101] Also, advice sought by trustees concerning their own imminent criminal or civil liability does not fall within the exception and is privileged.[102] At the other end, when administrators seek advice for the benefit of the plan, for beneficiaries, or for clearly administrative matters, the fiduciary exception applies.[103]

Administration of the plan may simply involve carrying out its purposes, which is done for the benefit of the beneficiaries, but might also involve a situation in which a "trustee seeks legal advice for his own protection . . . notwithstanding the fact that the legal advice may relate to the trustee's administration of the trust.."[104] In the latter instance,

> the legal fiction of "trustee as representative of the beneficiaries" is dispelled, notwithstanding the fact that the legal advice may relate to the trustee's administration of the trust . . . the core purposes of the attorney-client privilege are seriously implicated and should trump the beneficiaries' general right to inspect documents relating to plan administration.[105]

This analysis becomes difficult when a plan administrator is denying a beneficiary's claim. "[T]he denial of claims is as much a part of the administration of a plan as the decision-making which results in no unhappy beneficiary."[106] The decision to deny the claim can be argued to be related to a post-decision possibility of litigation and trustee liability. But in its essence it is about the claim.

---

[101] *Fischel*, 191 F.R.D. at 608; *see also In re Long Island Lighting Co.*, 129 F.3d at 271-72.

[102] *Mett*, 178 F.3d at 1066.

[103] *See Fischel*, 191 F.R.D. at 608; *see also In re Long Island Lighting Co.*, 129 F.3d at 271-72.

[104] *Mett,* 78 F.3d at 1065.

[105] *Id.*

[106] *Geissal v. Moore Medical Corp.*, 192 F.R.D. 620, 625 (E.D. Mo. 2000).

In *Geissal v. Moore Medical Corp.*, plan administrators contemplated terminating former-employee Geissal's COBRA coverage.[107] They sought advice concerning their legal position and Geissal's eligibility.[108] After benefits were terminated, Geissal sued the plan and sought discovery of the advice given the administrators both before and after the termination decision.[109] The administrators invoked the attorney-client privilege, claiming they sought the advice in preparation for litigation, not for plan administration.[110]

The court found that terminating coverage was an administrative matter for which the fiduciary exception applied and allowed discovery of "a legal opinion from attorney Mlynarczyk before the decision to terminate Mr. Geissal's COBRA coverage was finally made, [obtained] to determine 'whether we had a sound legal basis for terminating COBRA coverage.'"[111] *Geissel* noted that a contrary holding would bar discovery of all pre-decisional legal advice "whenever the administration of a plan involves the denial of a beneficiary's claim or benefits under a plan," which would be contrary to "the principle that the plan's administrator or trustee administers the plan in the beneficiaries' best interest."[112] The *Geissal* court ordered production of a legal opinion dated January 31st, memorializing a verbal discussion which occurred prior to the denial notice issued on January 27th.[113]

---

[107] *Id.* at 622.

[108] *Id.*

[109] *Id.* at 622-23, 625-26.

[110] *Id.* at 622.

[111] *Id.* at 625.

[112] *Id.*

[113] *Id.*

In *Lewis v Unum Corp. Severance Plan*[114] the court ordered production of minutes of a meeting held the day Lewis's claim was denied. Besides the plan administrator, HR representative, and members of the Benefit Administrative Committee, in-house and outside counsel for Unum were present.[115] The minutes were taken and typed up by in-house counsel. The court firmly rejected the idea that the discussions in this meeting were privileged:

> If the Court finds, as Defendants appear to allege, that the pre-decisional legal advice was secured for the purpose of defending against the disagreement and claims of Plaintiff in prospective post-decisional litigation against the plan, then it follows that whenever the administration of a plan involves the denial of a beneficiary's claim or benefits under a plan, all of the pre-decisional legal advice of counsel would be subject to the attorney-client privilege and not available for review by the beneficiaries of the plan, including the disappointed beneficiary. This contradicts the principle that the Plan's Administrator administers the plan in the beneficiaries' best interests. Because denying benefits to a beneficiary is as much a part of the administration of a plan as conferring benefits to a beneficiary, the prospect of post-decisional litigation against the plan is an insufficient basis for gainsaying the fiduciary exception to the attorney-client privilege.[116]

The disputed August 4th file memo was written two weeks before the decision on Gundersen's appeal. MetLife had not finally acted at the time the advice was given. While it can be said that this advice was sought to protect the administrator against liability, it was fundamental in the appeal determination and was given to ensure that the plan did the right thing in its administrative decision. To allow MetLife to claim privilege would bar the claimant and other beneficiaries from any discovery of legal advice given on plan claim decisions.

> All beneficiaries, including the ultimately disappointed beneficiary, are entitled to know what the legal opinion was, in its oral and written forms. . . . [Claimant] and the other beneficiaries of the plan were the clients . . . not the administrator. Therefore, the attorney-client privilege is inapplicable to bar the production of

---

[114] 203 F.R.D. 615 (D. Kansas 2001).

[115] *Id.* at 618.

[116] *Id.* at 620.

counsel's communications with the plan administrator upon which this decision of the plan depended."[117]

The discovery request for the unredacted document is a proper subject for discovery. However, because cases state the document's content and context are central to the analysis of eventual production,[118] if there is an objection to the discovery request, the final decision about discovery in this case would be made after in camera review by the presiding or referred judge.[119]

## ORDER

IT IS HEREBY ORDERED that Gundersen may send the discovery as revised by this order, and that the parties shall submit a proposed schedule within fourteen days.

Dated February 7, 2011.

BY THE COURT:

David Nuffer
U.S. Magistrate Judge

---

[117] *Geissal*, 192 F.R.D. at 625.

[118] *See Mett*, 178 F.3d at 1064; *see also Fischel*, 191 F.R.D. at 610; *Hudson*, 73 F. Supp.2d at 203.

[119] *See Fischel*, 191 F.R.D. at 607 (noting analysis came after *in camera* review); *see also Hudson*, 73 F.Supp.2d at 202 (same).